## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **WILLIAM A. LYLES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 11-CV-4208** |
| | ) | |
| **v.** | ) | **Magistrate Judge Susan E. Cox** |
| | ) | |
| **MICHAEL J. ASTRUE, Commissioner** | ) | |
| **of Social Security** | ) | |
| | ) | |
| **Defendant.** | ) | |

### MEMORANDUM OPINION AND ORDER[1]

Plaintiff, William Augustus Lyles, seeks judicial review of a final decision of the Commissioner of the Social Security Administration ("SSA") denying his application for a period of disability, disability insurance benefits, and Supplemental Security Income Benefits ("disability benefits") under the Social Security Act, 42 U.S.C. §§416(I), 423, and 1381 *et seq.* ("the Act"). Mr. Lyles has filed a motion for summary judgment, seeking to reverse the Commissioner's final decision or remand the matter for additional proceedings [dkt. 44]. For the reasons set forth below, Mr. Lyles's motion is granted and the case is remanded to the SSA for further proceedings.

## I. PROCEDURAL HISTORY

Mr. Lyles applied for disability benefits on June 8, 2007, alleging that he had been unable to work since November 1, 2001, because of stress, numbness on his left side, a heart condition, and various types of chest pain.[2] This was not his first application for disability benefits. He was

---

[1]On March 5, 2012, by the consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1(b), this case was assigned to this Court for all proceedings, including entry of final judgment [dkts. 34, 36].
[2]R. at 209, 245.

previously denied in October 2002.[3] His present claim was denied on August 8, 2007.[4] Mr. Lyles

then filed a request for reconsideration on August 14, 2007,[5] which was denied on October 16,

2007.[6] On November 23, 2007, Mr. Lyles requested a hearing before an Administrative Law Judge

("ALJ"), which was granted on May 8, 2009.[7] A hearing took place before ALJ Judith Goodie on

June 1, 2009.[8] Following the hearing, the ALJ issued an unfavorable decision, concluding that Mr.

Lyles was not disabled within the meaning of the Act at any time after his application was filed.[9]

After granting Mr. Lyles more time to submit additional evidence, the Appeals Council denied Mr.

Lyles's request to review the ALJ decision on February 7, 2011, meaning the ALJ's decision is the

final decision of the Commissioner.[10] Mr. Lyles filed this action on June 21, 2011. He filed his

motion for summary judgment on May 14, 2012.

## II.    FACTUAL BACKGROUND

The facts set forth under this section are derived from the administrative record. We begin

with an overview of Mr. Lyles's medical records from before his current application for disability

benefits, then of the period between the application and his ALJ hearing. We then summarize the

ALJ hearing testimony and the ALJ's decision. Finally, we review some medical evidence that was

obtained after the hearing.

---

[3]R. at 241.
[4]R. at 88.
[5]R. at 98.
[6]R. at 105.
[7]R. at 139. This notice was returned to the SSA by the USPS (R. at 188). The notice was resent on May 12, 2009 (163). Mr. Lyles acknowledged receipt of the latter notice on May 13, 2009 (R. at 187).
[8]R. at 14.
[9]R. at 73-87.
[10]R. at 8, 3.

A.      **Medical Records Prior to Mr. Lyles's Application**

On June 18, 2002, Mr. Lyles was arrested and taken to Michael Reese Memorial Hospital

in Chicago, Illinois ("Michael Reese") because he complained of chest pain after police put him in

handcuffs.[11] He was admitted at 3:56 p.m., shortly after which he complained of moderate pain,

which went away by 7:30 p.m.[12] Over the course of that time period, Mr. Lyles had his labs taken,

was placed on a cardiac monitor, and an EKG and chest x-ray were completed, all of which were

normal.[13] Specifically, in terms of his labs, Mr. Lyles's troponin was found to be less than .1, which

indicates "non-cardiac related disorder" or "healthy."[14] He was diagnosed with "Chest Pain L" and

"Chest Wall Pain" and  discharged at 8:15 p.m. the same night.[15] His discharge instructions stated

that he could return to work that day and that he should follow up with an internal medicine

physician within two days.[16] The hospitalization documentation also indicates that Mr. Lyles was

a smoker.[17]

There is no indication in the record that Mr. Lyles followed up within two days. However,

on July 26, 2002, he completed an echo and exercise test at Northwestern Memorial Hospital in

Chicago, Illinois ("Northwestern").[18] The cardiologist's final report indicated that the study showed

"no evidence of exercise induced myocardial ischemia" and the corresponding electrocardiogram

("ECG") showed that Mr. Lyles's sinus rhythm was "within normal limits."[19]

Mr. Lyles next reported chest pain on February 27, 2006, to his primary care provider, Syeda

---

[11]R. at 326, 328.
[12]R. at 326, 330.
[13]R. at 329, 331, 332-337.
[14]R. at 598.
[15]R. at 329.
[16]R. at 337.
[17]R. at 338.
[18]R. at 338.
[19]R. at 340, 342.

Shariff, M.D., of the Komed Holman Health Center in Chicago, Illinois ("Komed").[20] During that clinic visit, a medical assistant noted that Mr. Lyles "feels soreness at heart area and occasionally gets sharp pain in same area occasionally shortness of breath when resting."[21] He was assessed as having "chest pain," ordered to undergo blood testing, and referred for a stress test at Provident Hospital.[22]

Mr. Lyles did not undergo the stress test as ordered, instead receiving one after he presented to the emergency department ("ED") at Mercy Hospital and Medical Center in Chicago, Illinois ("Mercy") on June 1, 2006 after waking up in the night from chest and right flank pain.[23] He was taken to the hospital by ambulance.[24] Mr. Lyles reported to the ED physician that he had a history of having had a heart attack, as well as tuberculosis, chest pain, and other heart problems.[25] Mr. Lyles was admitted for observations and tentatively diagnosed with right flank pain, chest pain, right sided renal colic, and coronary artery disease.[26] Later that day, he reported that he had no pain.[27] During his hospitalization at Mercy, Mr. Lyles had labs drawn and underwent ECG and exercise stress testing, and a CT scan.[28] The labs were not addressed in any notes or in the discharge summary. But the lab results specifically identify that Mr. Lyles's triponin-I level was below even the borderline range of being indicative of having suffered a heart attack.[29] Mr. Lyles terminated the exercise test early because of fatigue.[30] The Mercy cardiologist interpreted the results as showing

---

[20]R. at 521.
[21]*Id.*
[22]R. at 524.
[23]R. at 347-48, 350.
[24]R. at 596.
[25]R. at 347, 357.
[26]R. at 346.
[27]R. at 358, 360.
[28]R. at 364-94.
[29]R. at 366.
[30]R. at 374.

occasional premature ventricular contractions, no clinical evidence of ischemia, and no clinical evidence of ischemia.[31] The cardiologist noted a physiological blood pressure response to exercise and noted that Mr. Lyles's functional capacity was moderately decreased by twenty to thirty percent.[32] Although Mr. Lyles did not reach eighty-five percent of his maximum heart rate, the cardiologist concluded that the exercise test was negative.[33] The CT scans performed during the stay showed that Mr. Lyles had a one millimeter kidney stone as well as a mildly enlarged heart and a slightly tortuous aorta.[34] The results were interpreted as indicating that Mr. Lyles's chest was stable and that no active disease was present.[35] The day after Mr. Lyles was admitted and the tests were performed, he was discharged.[36] The discharging physician diagnosed him with right flank pain from nephrolithiasis (a kidney stone) followed by atypical chest pain.[37] His secondary diagnoses were tobacco dependence and angina.[38]

Mr. Lyles's next medical visit was at Komed on May 30, 2007, when he appeared to have blood drawn for the testing ordered by Dr. Shariff over a year earlier, in February 2006.[39] He followed up on June 4, 2007.[40] The lab results were not addressed in the treatment notes from this visit, but Dr. Shariff noted that Mr. Lyles was complaining of right temple pain and sharp pain in the side of his chest.[41] She prescribed Nitroclycerin, as needed, for chest pain and ordered another

---

[31]R. at 373.
[32]*Id.*
[33]*Id.*
[34]R. at 370-71.
[35]R. at 371.
[36]R. at 362.
[37]*Id.*
[38]*Id.*
[39]R. at 526.
[40]R. at 531-33.
[41]R. at 531.

stress test.[42] She also referred Mr. Lyles to an opthalmologist.[43] The documentation from this and subsequent Komed visits states that pain was not affecting Mr. Lyles's activity level and that he did not want his provider to address pain.[44] However, this is a typed response, and there is no indication as to whether Mr. Lyles was actually asked these questions or whether the responses appear as a result of the form being automatically filled out.

### B.    Period between Mr. Lyles's Application & the ALJ Hearing

Mr. Lyles applied for disability benefits on June 8, 2007, complaining of stress, numbness on the left side, chest and chest wall pain, a heart condition, a bruised myocardium, and temple pain.[45] He reported that his conditions had caused him to stop being able to work as of November 1, 2001, because he was "unable to continue with even the most basic job duties."[46] Particularly, he was "unable to do any stooping, bending, lifting, or carrying," got dizzy a lot, tired easily, was unable to sleep at night due to pain, was unable to stand too long or walk too far, tired after walking four blocks, and had difficulty going up and down stairs.[47] The corresponding portion of the disability report, that was filled out by a SSA representative, notes that Mr. Lyles "sits, stands, [and] walks with ease [without any] visible physical discomfort."[48]

Ten days later, on June 18, 2007, Mr. Lyles returned to Komed complaining of tiredness.[49] A lab test performed the same day showed a normal level of Thyroid Stimulating Hormone.[50] The notes from this visit also indicate that Mr. Lyles had an appointment with an ophthalmologist on July

---

[42]R. at 532.
[43]R. at 533.
[44]*E.g.* R. at 531.
[45]R. at 209, 245.
[46]R. at 245.
[47]R. at 245.
[48]R. at 242.
[49]R. at 535.
[50]R. at 536.

27, 2007 and for a stress test at Provident Hospital on July 31, 2007.[51] He returned to Komed on July 5, 2007 to follow up from his previous visit, but with no new complaints or diagnoses.[52] There is no evidence in the record that Mr. Lyles attended an ophthalmology appointment on July 27[53] and although the notes from Komed indicated that Mr. Lyles was scheduled for a stress test at Provident on July 31, on this date he actually presented at a clinic at the Ambulatory and Community Health Network of Cook County, in Chicago, Illinois, ("ACHN") adjacent to Provident Hospital, but actually affiliated with John Stroger Hospital of Cook County.[54] The ACHN note indicated that Mr. Lyles only had an appointment to check up on a heart condition.[55] There is no mention that he had another stress test performed at this time and the only evaluation made at the ACHN appears to be "atypical chest pain."[56] The notes do indicate that Mr. Lyles was still a smoker and that smoking cessation was discussed.[57]

On August 1, 2007, as part of the SSA's reviewing of Mr. Lyles's file, Frank Jimenez, M.D., a state agency physician, completed a Physical Residual Functional Capacity ("RFC") Assessment based on Mr. Lyles's medical record.[58] Dr. Jimenez concluded that Mr. Lyles was able to lift fifty pounds occasionally, twenty five pounds frequently, stand and/or walk about six hours in an eight hour workday, sit for a total of about six hours in an eight hour workday, and push and pull without limit.[59] He concluded that Mr. Lyles had no postural, manipulative, visual, communicative, or

---

[51]R. at 537.
[52]R. at 537-38.
[53]R. at 537.
[54]R. at 486; Ambulatory and Community Health Network of Cook County, http://www.cchil.org/dom/ahcn.html, (last visited September 13, 2012).
[55]R. at 486.
[56]Id.
[57]Id.
[58]R. at 478-85.
[59]R. at 479.

environmental limitations.[60] Dr. Jimenez's report also stated that there was no treating or examining source statement regarding Mr. Lyles's physical capacities in his file.[61] It also referenced both stress tests Mr. Lyles has conducted, noting that they were both negative and that there was no other evidence of ischemia.[62] Dr. Jimenez also noted that there were no significant neurological and musculoskeletal exam findings, that Mr. Lyles had normal gait and did not use an assistive device, and that there was no evidence of end organ damage due to hypertension.[63]

On August 6, 2007, Mr. Lyles again followed up at Komed for a nitroglycerin refill.[64] During this visit, it was noted that Mr. Lyle's stress test appointment was scheduled for September 25, 2007 at Provident Hospital.[65] Two days after this visit, Mr. Lyles's disability claim was denied. On August 18, 2007, he filed a request for reconsideration.[66] In his accompanying disability report, he stated that as of July 7, 2007, the pain in his chest had increased and that he was taking more pain killers.[67] He also reported feeling more tired and increased shortness of breath.[68] He reported that he would be undergoing additional cardiac testing at Provident Hospital on September 25, 2007.[69]

There is no evidence in the record to suggest that Mr. Lyles completed any additional stress tests at Provident. Subsequently, on October 10, 2007, David Mack, M.D., another state agency physician reviewed Mr. Lyles's file, which included his visits to Komed in July and August 2007,

---

[60]R. at 480-82.
[61]R. at 484.
[62]R. at 485.
[63]R. at 485.
[64]R. at 538-40.
[65]R. at 539.
[66]R. at 88-91, 98-101.
[67]R. at 305.
[68]*Id.*
[69]R. at 308.

as well as his note from ACHN, none of which were reviewed by Dr. Jimenez in his assessment.[70] Dr. Mack found that the new evidence did not change Dr. Jimenez's assessment of Mr. Lyles's RFC and reaffirmed Dr. Jimenez's report.[71] Mr. Lyles's request for reconsideration was subsequently denied.[72] The next day, on October 17, 2007, Mr. Lyles obtained a non-attorney representative, Vicky Stewart.[73] Ms. Stewart worked for the Southern Illinois Center for Independent Living in Harrisburg, Illinois, and was experienced in helping Social Security Disability applicants.[74]

Following this denial, Mr. Lyles missed his next scheduled appointment at Komed on October 30, 2007.[75] However, he returned on November 19, 2007 to have additional paperwork completed by Dr. Shariff for his disability application, in preparation for applying for an ALJ hearing.[76] During this visit, he reported to Komed staff that he "was not seen" at an appointment with the cardiologist at Provident Hospital on October 31, 2007.[77] Also at this visit, Dr. Shariff prescribed Mr. Lyles more nitroglycerin for his chest pain.[78]

The form that Dr. Shariff filled out was an Illinois Department of Human Services Medical Evaluation ("medical evaluation").[79] On the form, she stated that she had been seeing Mr. Lyles once a year since January 9, 2001, until recently, when the frequency increased to once per week.[80] She stated that his complete diagnosis was "chest pain."[81] She stated that Mr. Lyles had greater than fifty

---

[70]R. at 487-89, 306. Mr. Lyles reported to the SSA that he visited Provident, when he had in fact visited the adjacent ACHN.
[71]R. at 489.
[72]R. at 105.
[73]R. at 110.
[74]R. at 132.
[75]R. at 540-41.
[76]R. at 541.
[77]*Id.*
[78]R. at 541-42.
[79]R. at 492-94.
[80]R. at 492.
[81]*Id.*

percent reduced capacity in: walking, bending, standing, stooping, climbing, pushing, and pulling, twenty-to-fifty percent reduced capacity in turning and travel, and up to twenty percent reduced capacity in sitting, fine manipulations, and grasping.[82] She further reported that Mr. Lyles had up to twenty to fifty percent reduced capacity in his ability to perform physical activities of daily living and could not lift more than 10 pounds at a time.[83] This form was accompanied by a "To Whom It May Concern" letter, which stated:

> This letter is to advise that WILLIAM has been under my medical care since 2001. He has been suffering from chest pain since 2001, also get dizzy on bending & gets tired on walking. He is unable to work due to the above symptoms. Patients has been referred to Provident hospital- CARDIOLOGIST.[84]

Mr. Lyles then requested an ALJ hearing on November 23, 2007. On his affiliated disability report, he stated that as of September 2007, his "conditions are worse" and that he has "more [conditions] and take[s] more medication."[85] He additionally stated that as of August 15, 2007, his "capacity for walking has reduced more than 50%. In addition, I cannot bend, stoop or stand without pain."[86] He also reported being more easily agitated and more stressed, as of October 2007.[87]

Mr. Lyles missed his next two appointments at Komed, a medical appointment on December 17, 2007, and a dental appointment on March 3, 2008.[88] On April 6, 2008, he presented to Mercy complaining of having had chest pain for two weeks.[89] He reported to Dr. Shariff that the hospitalization was after a car accident, but there is no mention of having been in any accident in

---

[82]R. at 494.
[83]*Id.*
[84]R. at 490.
[85]R. at 315.
[86]*Id.*
[87]*Id.*
[88]R. at 546, 547.
[89]R. at 495.

the hospital documentation.[90] Mr. Lyles claimed during his hospitalization that he had suffered multiple heart attacks in the past and suffered from a bruised myocardium as the result of having given himself a myocardial thump in the past.[91] He also complained of hip pain and shortness of breath.[92] The discharging physician, Peter Brukasz, M.D., documented that Mr. Lyles's vital signs were stable, that he was in no apparent distress, lying comfortably, and that his eye, mouth, and neck exams were normal.[93] He also noted that Mr. Lyles's heart rhythm was "irregularly irregular."[94] Mr. Lyles also had reproducible chest pain.[95] His gastrointestinal exam was normal.[96] He had pinpoint left hip tenderness over his hip joint, with no limitation of the range of motion.[97] He had 5/5 strength globally and his extremity exam was normal.[98] Mr. Lyles was admitted for cardiac monitoring but was noncompliant with the cardiologist and his service.[99] His ECGs were normal during his hospitalization.[100] He had a stress test, which was negative.[101] Mr. Lyles was discharged on April 10, 2008, with instructions to follow up with his primary care physician one week after discharge and to complete a coronary angiogram as an outpatient.[102] His final primary diagnosis was chest pain; his secondary diagnoses were left hip pain, leukocytosis, and arrhythmia.[103] One of the Mercy physicians opined that Mr. Lyles's condition was not disabling.[104]

---

[90] R. at 548; *see* R. at 495-498.
[91] R. at 495.
[92] *Id.*
[93] R. at 496.
[94] *Id.*
[95] *Id.*
[96] *Id.*
[97] *Id.*
[98] *Id.*
[99] R. at 497.
[100] *Id.*
[101] *Id.*
[102] R. at 497-98.
[103] R. at 495.
[104] R. at 619.

There is no evidence that Mr. Lyles followed up with Dr. Shariff after one week. On April 28, eighteen days after he was discharged from Mercy, Mr. Lyles "gave paperwork to [Dr. Shariff] and left . . . without being seen."[105] On May 12, 2008, he returned to Komed to see Dr. Shariff.[106] Three new complaints were added to his file, coronary artery disease ("CAD"), cardiac arrhythmia, and hyperlipidemia.[107] The note from this visit states that Mr. Lyles refused a "carotid angiogram" after he was informed of the risks.[108] (However, it is documented that Mr. Lyles received a handout regarding "coronary angiogram."[109] Since Dr. Brukasz at Mercy instructed Mr. Lyles to receive a coronary angiogram, we assume Mr. Lyles, in fact, declined a coronary angiogram, not a carotid angiogram.) There is no discussion of how the diagnoses of CAD, cardiac arrhythmia, and hyperlipidemia were reached. Mr. Lyles did not appear in any acute distress.[110] On May 27, Mr. Lyles returned to Komed to obtain a letter permitting him to have dental work done, which he received.[111]

Six weeks later, on June 23, 2008, Mr. Lyles made a request for an "On the Record Decision."[112] Before it was responded to, on July 7, he returned to Komed requesting a "letter for S[ocial] Security" and medication refills.[113] Dr. Shariff prescribed Mr. Lyles new medications: enalapril maleate, naproxen, metoprolol tartrate, lovostatin, and aspirin.[114] She did not give any new diagnoses or document that she was giving new medications. She did write another "To Whom it

---

[105]R. at 548.
[106]R. at 549.
[107]*Id.*
[108]R. at 550.
[109]R. at 551.
[110]R. at 550.
[111]R. at 552, 553.
[112]R. at 312-22.
[113]R. at 564.
[114]R. at 565.

May Concern" letter:

> This letter is to advise that WILLIAM has been under my medical care since 2001. He has been suffering from chest pain since 2001 & also suffers from muscle strain, dyslipidemia, coronary artery disease & heart arrhythmia. He is unable to work due to the above symptoms.[115]

On August 8, Mr. Lyles returned to Komed seeking another "To Whom it May Concern" letter. This time, Dr. Shariff stated:

> This letter is to advise that WILLIAM has been under my medical care since 2001.
> He suffers from
> 1. Coronary artery disease
> 2. Cardiac arrhythmia
> 3. Hyperlipidemia
> 4. Tiredness
> 5. Headache
> 6. Chest pain
> 7. Muscle Strain- cardiac.
> He is on 5 different medications.
> Mr. Lyes was gainfully employed & in school persuing physician's assistance program @ Malcomix college up till 2001. Because of the above conditions he was unable to work & continue his education- no funds.
> Mr. Lyes has chest pain almost every day @ rest at present. He definitely needs disability since he can not work.

Shortly after this letter was sent, Mr. Lyles requested another On the Record Decision.[116] In the mean time, he had also contacted Senators Obama and Durbin, asking them to intervene in the case.[117]

On September 22, 2008, Mr. Lyles once again returned to Komed.[118] He complained of "a funny feeling" and popping sensation in his left ear, mild pain, depression, and "all the physical

---

[115]R. at 558.
[116]R. at 127-28.
[117]R. at 125-26, 129.
[118]R. at 560.

complaints- since 2001."[119] Dr. Shariff diagnosed an anxiety disorder and prescribed Paxil.[120]On

December 2, 2008, he again returned to Komed, stating that he wanted the disability letter

rewritten.[121] He also stated he was taking vicodin, as it calmed him.[122] Dr. Shariff rewrote the letter

(although it does not appear in the administrative record), renewed Mr. Lyles's nitroglycerin, and

prescribed him vidodin.[123]

On February 2, 2009, Mr. Lyles returned to Komed, but left without being seen by Dr.

Shariff.[124]He returned two days later, complaining that his left chest pain had been constant since

2008.[125] He also complained of ear and tooth pain.[126] On April 8, 2009, he visited Dr. Shariff again,

complaining again of pain in his ear and teeth.[127] He had not seen the dentist since the pain started.[128]

He also complained of constant pain in his chest and that "nothing" improves the pain.[129] Dr. Shafiff

prescribed erythromycin and refilled his enalapril maleate, lovastatin, and metoprolol tartrate.[130]

### C.    ALJ Hearing

Ms. Stewart, Mr. Lyles's non-attorney representative, was not present at the hearing.[131] She

corresponded with ALJ Goodie before the hearing stating that she was unable to attend the hearing

because of her distance from Chicago.[132] She also wrote that Mr. Lyles specifically did not want an

attorney representing him because he was afraid that he would be exploited and that an attorney

---

[119]*Id.*
[120]R. at 561.
[121]R. at 582.
[122]*Id.*
[123]R. at 583.
[124]R. at 593.
[125]R. at 590.
[126]*Id.*
[127]R. at 587.
[128]*Id.*
[129]*Id.*
[130]R. at 588
[131]R. at 14.
[132]R. at 132.

would not be able to provide good enough personalized service.[133] The ALJ responded that Ms.

Stewart could participate in the hearing by telephone if both she and Mr. Lyles signed a statement

consenting to it.[134] Ms. Stewart and Mr. Lyles did so.[135]

     The hearing before the ALJ occurred on June 1, 2009 in Chicago, Illinois.[136] Ms. Stewart

appeared by telephone.[137] Mr. Lyles was present, as were a vocational expert, Lee Knutson ("VE"),

and a medical expert, Sheldon Slodki ("ME").[138] Dr. Slodki is an internal medicine physician who

specializes in cardiology.[139] Mr. Lyles was also accompanied by Ava Lawson, a friend with whom

he lives, and whom he had previously identified as his fiancee.[140]

### 1. Mr. Lyles's Testimony

     Mr. Lyles began his testimony by affirming that he had completed two years of college and

had a license as an emergency medical technician.[141] He claimed to have stopped working in that

field in 2001 after suffering a heart attack in 2000.[142] He had previously worked transporting patients

by ambulance, as well as in the coronary care unit at Michael Reese, as a patient care technician at

Silver Cross Hospital in Joliet, Illinois, and as a pediatric care technician in Forest Park, Illinois.[143]

He had not looked for work since 2001 because of pain in the area around his heart, shortness of

breath, difficulty walking long distances, and difficulty standing for a long time.[144]

---

[133]*Id.*
[134]R. at 130-31.
[135]R. at 136.
[136]R. at 14.
[137]*Id.*
[138]*Id.*
[139]R. at 137.
[140]R. at 14, 356.
[141]R. at 16.
[142]*Id.*
[143]R. at 17.
[144]*Id.*

In terms of his life outside of work, he lived in a garden apartment with Ms. Lawson, five steps below street level, which he was able to navigate without difficulty.[145] He drove regularly, participated in household chores, ran basic errands, watched television, and read books.[146] In terms of television, he enjoyed watching educational programs, documentaries, and shows about history and science.[147] He enjoyed watching movies, but was unable to watch a whole movie without beginning to feel agitated.[148] He walked every day for five to ten minutes.[149] He was unable to lift weights and had difficulty raising his arms in the air.[150] He could life a gallon of milk with his right hand, but had difficulty lifting anything with his left hand.[151] Mr. Lyles no longer smoked or drank alcohol.[152] Once or twice, in an attempt to relieve pain, Mr. Lyles used phencyclidine mixed with cocaine.[153] However he did not like the feeling and has not used illicit drugs otherwise.[154]

In terms of Mr. Lyles's health, he testified that other than his chest pain, he experienced "a numbing sensation and slight tingle" in his fingers that had been present since 2001 as well as temple pain that "fluctuate[s] from the left to the right side."[155] Regarding the headaches, he stated that he did not know "what's going on over there."[156] In terms of his chest pain, Mr. Lyles claimed that he had been told that his myocardium was bruised and that he had been suffering from this particular muscular pain in the region since 2009.[157] He was taking Motrin, prescribed by Dr.

---

[145]R. at 18.
[146]R. at 18-19.
[147]R. at 30.
[148]*Id.*
[149]R. at 19.
[150]R. at 30-31.
[151]R. at 31.
[152]R. at 20.
[153]R. at 20-21.
[154]*Id.*
[155]R. at 22.
[156]*Id.*
[157]R. at 22-23.

Shariff.[158] He also claimed that Dr. Shariff prescribed him Vicodin for the chest pain.[159]

The ALJ then asked Mr. Lyles whether he had any other physical conditions besides the ones that he had mentioned that effected his ability work.[160] Mr Lyles responded "[n]ot that I can think of."[161] In terms of current medications, he was taking aspirin, nitroglycerin, metoprolol, Vasotec, lovastatin, paroxetine for anxiety, and antibiotics for an ear infection.[162] Returning to the chest pain, Mr. Lyles testified that there were different pains: fleeting sharp pain that felt like paper cuts, shooting through the heart periodically throughout the day, every day, and a more tender, constant pain.[163] He claimed he could walk ten to fifteen minutes before becoming short of breath and that he cannot sit for more than a few minutes without becoming agitated.[164] When the ALJ asked Mr. Lyles about his anxiety, he testified that he did not know if the medication was helping.[165] He said it was making him break out in a rash.[166]

Next, Ms. Stewart interviewed Mr. Lyles.[167] When asked how he was doing psychologically throughout the process, he testified that he was "not doing well at all," devastated that he was no longer a productive member of society.[168] He stated that he had become more depressed, since he did not have money or medical insurance to take care of his heart or to give to his grandchildren.[169] Relying on Ms. Lawson for money made him feel burdensome.[170] The ALJ then asked Mr. Lyles if

---

[158]R. at 23.
[159]R. at 25.
[160]Id.
[161]Id.
[162]Id.
[163]R. at 26-27.
[164]R. at 27-28.
[165]R. at 28.
[166]Id.
[167]R. at 35.
[168]R. at 36, 35.
[169]R. at 36.
[170]Id.

he had sought treatment for his psychological condition, which he testified he had not.[171] Furthermore, he had stopped taking the Paxil that Dr. Shariff had prescribed for his anxiety, because it made him feel "hyper and nervous and jittery."[172]

Next, the ME questioned Mr. Lyles.[173] The ME asked Mr. Lyles if he knew that myocardial infarction was the medical terminology for a heart attack.[174] Mr. Lyles testified that he did and that he had never been admitted to a hospital for myocardial infarction and that it had never been diagnosed when he had been hospitalized.[175]

## 2. ME's Testimony

The ME then testified that the record indicated that Mr. Lyles had never, in fact, suffered a heart attack.[176] He then stated that in terms of Listing 4.04, there are two treadmill tests in the record, dated June 2, 2006 and July 26, 2002, both of which "indicate a normal ejection fraction" and "no evidence of a fixed defect or a reversible defect."[177] He said the ejection fraction of fifty percent, that was found in the studies, was "above listing level."[178] The ME then stated that Listing 4.05 was not satisfied because it requires, and there is no evidence of, "syncable episodes related to a holter monitor confirmed arrhythmias."[179] He said that after having reviewed the ECGs, there was no evidence of "any significant heart disease" and that the "chest pain that he's described" is "atypical and . . . not typical of angina."[180] He also stated that Mr. Lyles's chest pain has never been

---

[171]R. at 36-37.
[172]R. at 37.
[173]*Id.*
[174]R. at 39.
[175]*Id.*
[176]R. at 40.
[177]R. at 41.
[178]*Id.*
[179]*Id.*
[180]R. at 42.

specifically evaluated, as far as he could tell from the record.[181] Since the cardiology work-up at Mercy in 2008 was negative, the ME did not know the origin of Mr. Lyles's pain.[182] Furthermore, he testified that there was no medical evidence in the record referencing Mr. Lyles's alleged finger tingling, which could be "associated with angina [or] neuropathy."[183] He then testified that the atypical chest pain was not angina and that there was no evidence of neuropathy in the record.[184] The ME then stated that Mr. Lyles had mild hypertension, for which he was medicated.[185]

The ALJ then asked the ME to assess Mr. Lyles's RFC.[186] He testified that he agreed with Dr. Jimenez's RFC assessment findings that Mr. Lyles was capable of medium exertion.[187] He disagreed with Dr. Shariff's assessment that Mr. Lyles was capable only of sedentary exertion.[188] He reasoned that there was no documented objective evidence to support Dr. Shariff's findings and that the two exercise test results supported Dr. Jimenez's assessment.[189]

Next, Ms. Stewart asked the ME whether the reference to an "indication of treatment of pulmonary embolism" in Mr. Lyles's 2008 Mercy discharge summary was pertinent to Mr. Lyles's claim.[190] The ME testified that it was not, since Mr. Lyles did not have a pulmonary embolism diagnosed at that hospitalization.[191] Mr. Lyles then reported to the ME that the stress test that was documented in the 2008 Mercy note was not actually performed, even though it was noted that the

---

[181]R. at 42.
[182]Id.
[183]Id.
[184]R. at 42-43.
[185]R. at 43.
[186]Id.
[187]R. at 44.
[188]Id.
[189]R. at 44-45.
[190]R. at 47-48.
[191]R. at 48.

stress test was negative.[192] He also stated that he refused the coronary angiogram because he was informed by the cardiologist that there was a fifteen percent chance of having a stroke.[193] The ALJ noted that this was not evidenced in the record.[194] Mr. Lyles then stated that on the day he had a heart attack, the "lord and Savior helped me that day."[195] The ME then stated that if Mr. Lyles had suffered a heart attack, that it would be evident from the ECGs or echo test results, which was not the case.[196] Finally, he testified that Mr. Lyles's medications were appropriate both for hypertension and coronary disease.[197]

### 3. VE's Testimony

Next, the VE testified.[198] He stated that Mr. Lyles had previously worked as a patient care technician, which is considered medium and semiskilled with a specific vocational preparation score ("SVP") of two when he worked with a pediatric population, but heavy with an SVP of four when he worked with an adult population, as he performed the work.[199] His work as an ambulance driver was very heavy and semiskilled, while his work as an EMT was skilled and medium.[200] As such, as Mr. Lyles peformed the work, since both roles were combined in the job, it was very heavy and skilled, with an SVP of five.[201] Mr. Lyles's past work as a material handler, which included operating a forklift, was heavy and semiskilled, with an SVP of three.[202] His past work as a security

---

[192]R. at 49.
[193]Id.
[194]R. at 50.
[195]R. at 51.
[196]R. at 51-52.
[197]R. at 64-65.
[198]R. at 52.
[199]R. at 52, 54.
[200]R. at 53.
[201]Id.
[202]R. at 54.

guard was light and semiskilled, with an SVP of three.[203]

The ALJ then asked the VE if an individual with the same age, educational background, and work experience as Mr. Lyles, and with an RFC as assessed by Dr. Jimenez in his report, at age fifty, could perform any of Mr. Lyles's past work.[204] This would include the ability to carry twenty-five pounds frequently and fifty pounds occasionally, sitting for six hours and standing and walking for six hours in an eight hour day, unlimited pushing and pulling, and no exertional limitations.[205] The VE testified that such a person could perform the job of patient care technician with a pediatric population and as a security guard.[206] Additionally, he could perform a job in the Chicagoland area as an assembler, a job with 17,200 vacancies, or a handpacker, with 16,000 vacancies, both of which are at the light exertion level.[207] Additionally, there are 35,000 vacancies as unskilled light cashiers.[208]

Next, the ALJ asked the VE if there would be any work for a person with an essentially sedentary RFC, who could lift ten pounds frequently, can sit up to eight hours, can stand and walk up to two hours, with occasional stairs and ramps and occasional postural movements, and frequent fine and gross movements.[209] The VE testified that for an individual under age fifty, there were under 2,900 jobs as bench assemblers, 1,000 as inspector checker and/or weighers, and approximately 3,600 as order clerks.[210] He also testified, after being asked by Ms. Stewart, that Mr. Lyles would have to contact the state to find out if he was a candidate for any state programs for the

---

[203]R. at 54.
[204]R. at 55.
[205]Id.
[206]Id.
[207]Id.
[208]R. at 56.
[209]Id.
[210]Id.

disabled.[211] Finally, in response to another question by the ALJ, he testified that Mr. Lyles did not have any transferrable skills from his past work.[212]

### 3. Ms. Lawson's Testimony

Next, Ms. Lawson was questioned by Ms. Stewart.[213] Ms. Lawson testified that Mr. Lyles was in constant pain, and that when he has chest pain, blood does not flow through his heart properly, causing him to be affected mentally.[214] She testified that psychologically, "he'd be like he stepped away from himself and he's not there and he gets angry because he's in pain."[215] She stated that at times he is in so much pain that he cries, other times she has to call him an ambulance.[216] She further testified that Mr. Lyles has short term memory loss, forgetting to take his medicine and whether he took it.[217] She stated that there were differences in Mr. Lyles behavior before and after his condition.[218] Before, he would go to the movies, sit down and watch television, and go to the grocery store.[219] Since his injury, however, he lays around a lot, sleeps a lot, and is unable to carry grocery bags in his left hand due to pain.[220]

Before concluding the hearing, the ALJ informed Ms. Stewart that he would keep the record open for an additional two weeks during which time he would appreciate receiving more up-to-date medical records, as there were no medical records in the file from after September 2008.[221] He also

---

[211]R. at 57-58.
[212]R. at 59-60.
[213]R. at 60.
[214]*Id.*
[215]*Id.*
[216]R. at 61.
[217]R. at 62-63.
[218]R. at 64.
[219]*Id.*
[220]*Id.*
[221]R. at 65-67.

invited her to have Dr. Shariff fill out an additional evaluation of Mr. Lyles's RFC.[222] The ALJ then concluded the hearing.[223]

### D.     Medical Evidence Obtained After ALJ Hearing

On June 15, 2009, on the ALJ's submission deadline, Mr. Lyles submitted another medical evaluation completed by Dr. Shariff.[224] Dr. Shariff reported that the last date she had examined Mr. Lyles was June 11, 2009.[225] She stated she had been treating him since 2001 and that the frequency of the visits were once per month.[226] She listed Mr. Lyles's chief complaints as chest pain, headaches, and tiredness, all present since 2001.[227] She listed his complete diagnoses as: coronary heart disease, cardiac arrhythmia, hyperlipidemia, chest pain, headaches, and anxiety disorder.[228] She evaluated his functional limitations as more than fifty percent reduced in: walking, bending, standing, stooping, turning, climbing, pushing, pulling, and fine manipulation.[229] The evaluation for Mr. Lyles's sitting limitations is ambiguous. It either indicates a greater than fifty percent limitation or less than twenty percent limitation, depending on whether the marking is interpreted as a "D" or a "B."[230] She evaluated his functional limitations as twenty to fifty percent reduced in travel and gross manipulation.[231] She indicated that he could not lift more than ten pounds at a time.[232] She stated his anxiety moderately limited his ability to perform activities of daily living

---

[222]R. at 66.
[223]R. at 67.
[224]R. at 600.
[225]*Id.*
[226]*Id.*
[227]*Id.*
[228]*Id.*
[229]R. at 603.
[230]*Id.*
[231]*Id.*
[232]*Id.*

and extremely limited his social functioning, concentration, persistence, and pace.[233]

### D. ALJ's Decision

In an opinion issued on June 22, 2009, the ALJ concluded that Mr. Lyles was not disabled within the meaning of the Act, both in terms of a period of disability and disability insurance benefits, and supplemental security income, at any time after his alleged onset date of November 1, 2001.[234] Although the ALJ found that Mr. Lyles met the insured status requirements of the Act through June 30, 2006, she opined that Mr. Lyles was unable to establish that he had a disability that would prevent him form working in any kind of gainful work generally available in significant numbers within the national economy, for one year or more, as required by SSA regulations.[235]

SSA regulations prescribe a sequential five-part test for ALJs to use in determining whether a claimant is disabled.[236] The ALJs' first step is to consider whether the claimant is presently engaged in any substantial gainful activity, which would preclude a disability finding.[237] In the present case, the ALJ determined that Mr. Lyles had not engaged in substantial gainful activity since November 1, 2001, his application date.[238] The second step is for the ALJ to consider whether the claimant has a severe impairment or combination of impairments.[239] In the present case, the ALJ concluded that Mr. Lyles had the medically determinable severe impairments of aytpical chest pain (non-anginal) and hypertension.[240] She also found that he had non-severe impairments, namely generalized anziety disorder, history of alcohol use in remission since 2006, complaints of muscular

---

[233]R. at 603.
[234]R. at 87.
[235]R. at 78, 85, 42 U.S.C. § 423(d)(1)(A).
[236]20 C.F.R. § 404.1520(a)(4).
[237]*Id.* § 404.1520(a)(4)(i).
[238]R. at 78.
[239]20 C.F.R. § 404.1520(a)(4)(ii).
[240]R. at 78.

pain in the left shoulder, and headaches.[241]

The ALJ's third step is to consider whether the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude gainful activity.[242] In the present case, the ALJ determined that Mr. Lyles's impairments did not meet or medically equal a listed impairment, even in combination, under 20 C.F.R. Part 404, Subpart P, Appendix 1.[243] She reviewed the listings under 4.00 (Cardiovascular), specifically finding that Mr. Lyles did not meet listing 4.04 (Ischemic Heart Disease).[244] She reasoned that the ME had testified that there was no evidence in the objective medical record of any significant cardiac disease.[245] She noted that the ME pointed to the fact that Mr. Lyles had never been found to have suffered a heart attack, that stress testing had been negative, and that ECGs were relatively normal.[246] Furthermore, the ME stated that although Mr. Lyles did suffer from hypertension, there was no medical evidence to suggest end organ damage.[247]

In the event that no impairments are found to meet SSA listing requirements, the ALJ proceeds to the fourth step of the test, which is to determine whether the claimant is able to perform his past relevant work.[248] This involves evaluating the claimant's RFC based on the record and his testimony and comparing it to the requirements of his past work.[249] If determining the claimant's RFC requires the ALJ to assess subjective complaints, then she follows a two-step process.[250] First,

---

[241]R. at 78-79.
[242]20 C.F.R. § 404.1520(a)(4)(iii).
[243]R. at 82.
[244]*Id.*
[245]*Id.*
[246]*Id.*
[247]*Id.*
[248]20 C.F.R. § 404.1520(a)(4)(iv).
[249]*Id.*
[250]*Id.* § 404.1529.

she determines whether there is an underlying medically determinable impairment, determinable by medically acceptable clinical and laboratory diagnostic techniques that could reasonably be expected to produce the claimant's symptoms.[251] If so, the ALJ then evaluates the intensity, persistence, and limiting effects of a claimant's symptoms on his ability to do basic work activities.[252] When making determinations about the credibility of the claimant's subjective complaints, the ALJ must consider the entire record.[253] The ALJ need only consider the subjective symptoms to the extent that they can reasonably be accepted as consistent with the objective medical evidence and other evidence.[254] If, after this process, the ALJ determines that the claimant's RFC makes her able to perform his past work, he is found not to be disabled.[255]

In the present case, the ALJ declined to decide whether Mr. Lyles was able to perform his past work based on his RFC.[256] She did assess his RFC, determining that he had the RFC to perform a range of medium work, with the ability to lift and carry fifty pounds occasionally and twenty-five pounds frequently with unlimited pushing and pulling capacity.[257] Furthermore, she found that he could sit for up to six hours and stand and walk up to six hours in an eight-hour work day.[258] In terms of Mr. Lyle's subjective complaints, the ALJ found that while his medically determinable impairments could reasonably be expected to cause some of his alleged symptoms, his statements regarding the intensity, persistence, and limiting effects of the symptoms were not credible.[259]

In her credibility determination, the ALJ laid out why she was discrediting Mr. Lyles's

---

[251] 20 C.F.R. § 404.1529(b).
[252] Id. § 404.1529(c).
[253] Id. § 404.1529(c)(4).
[254] Id.
[255] Id. § 404.1520(a)(4)(iv).
[256] R. at 85.
[257] R. at 82.
[258] Id.
[259] R. at 84.

subjective complaints.[260] Regarding his allegations of CAD, she points to the lack of any medical evidence supporting the claim.[261] She finds that Mr. Lyles was incorrect in testifying that he had suffered a heart attack, based on the ME's testimony and the fact that Mr. Lyles testified that he had never been admitted to a hospital to be treated for a heart attack, nor had he ever been diagnosed as having had a heart attack during any of his hospitalizations.[262] She found that the only references to heart attacks in the medical record were because of his own reports.[263]

The ALJ also discredited Mr. Lyles's subjective complaints of chest pain, fatigue, and shortness of breath.[264] She gives many reasons. First, she points out that Mr. Lyles testified at his hearing that Dr. Shariff prescribed him Vicodin for chest pain, while the notes from his visit indicate that she prescribed it once after he claimed it calmed him down.[265] Second, she points out the lack of any documentation in the medical record that describe Mr. Lyles's complaints of sharp, stabbing pain.[266] Third, she points to the fact that several ED visits indicate that his physical examination results were normal.[267] Finally, the ALJ notes that when, at the hearing, the ME found Mr. Lyles's most recent cardiac work up to be "quite benign," Mr .Lyles started describing "a somewhat different type of pain in his upper chest region."[268]

Next, the ALJ discredits the Ms. Lawson's hearing testimony, pointing out discrepancies between her and Mr. Lyles's testimonies.[269] Then, the ALJ discredits Mr. Lyles's contention that

---

[260]R. at 82-84.
[261]R. at 82.
[262]R. at 83.
[263]*Id.*
[264]*Id.*
[265]*Id.*
[266]*Id.*
[267]*Id.*
[268]*Id.*
[269]R. at 83.

he becomes agitated and out of breath when standing or sitting a short time, or when walking half a block, based on the fact that there is no objective evidence to support the claim.[270] She also discredits his claim that he is depressed, based on the fact that there are no diagnoses of depression anywhere in the record, except by Dr. Shariff after Mr. Lyles told her that he was depressed.[271] The ALJ also points out that Dr. Shariff's notes indicate that Mr. Lyles told Dr. Shariff that he wanted to stop taking Paxil because it makes him hyper, whereas he testified at his hearing that Dr. Shariff told him to stop taking the medication.[272]Dr. Shariff's evaluation from after the hearing, however, indicated that Mr. Lyles was still taking Paxil.[273] Because of this inconsistency and Mr. Lyles's failure to seek mental health treatment, the ALJ also found Mr. Lyles's complaints regarding the severity of his anxiety disorder not to be credible.[274]

Next, the ALJ found Mr. Lyles not to be credible in terms of his purported desire to work.[275] First, she pointed to Dr. Shariff's opinions that Mr. Lyles could perform sedentary work, while he claimed that his chest pain stopped him from being able to work in 2001.[276] Further she cited the ME, who testified that he believed Mr. Lyles to be capable of medium exertion work.[277] Since Mr. Lyles testified at the hearing that he wanted to work, but could not, the ALJ opined that Mr. Lyles was not credible as to this purported desire, since he had not made any attempt to look for any work.[278] Finally, the ALJ discredited Mr. Lyles's testimony regarding the tingling sensation in his

---

[270]*Id.*
[271]*Id.*
[272]*Id.*
[273]R. at 83-84.
[274]R. at 84
[275]R. at 83, 84.
[276]*Id.*
[277]R. at 84
[278]R. at 83, 84.

left hand.[279] She found that this complaint was not documented in the medical record, that Dr. Shariff did not address it in her June 11, 2009 evaluation, and that Dr. Slodki found no evidence of neuropathy.[280]

In evaluating Mr. Lyles's RFC, the ALJ also addressed the weight she was giving to Dr. Shariff's letters versus the assessments of the ME and Dr. Jimenez.[281] She stated that she was only giving some weight to Dr. Shariff's letters, since her opinions were based "almost entirely" on Mr. Lyles's subjective complaints.[282] In contrast, since the evaluations of the ME and Dr. Jimenez were grounded in objective medical evidence, she afforded them "substantial weight."[283]

Regarding Dr. Shariff's June 2009 RFC evaluation, the ALJ stated that she relies on it in the sense that it shows that Mr. Lyles can actually work a sedentary job.[284] Otherwise, she discredits it, determining that the evaluation contained no medical explanation for limiting Mr. Lyles to sedentary work.[285] She noted that Dr. Shariff's letters and medical evaluations are not supported by her own treatment notes.[286] For example, the ALJ mentioned that while in one of the medical evaluations Dr. Shariff limits Mr. Lyles's use of his hands, she also stated that his musculoskeletal and neurological systems are normal.[287] Furthermore, the ALJ found that Dr. Shariff does not offer any objective evidence to support her assertion that Mr. Lyles is extremely limited in his social function and concentration.[288] The ALJ pointed out that Dr. Shariff's treatment notes and Mr. Lyles's testimony

---

[279]R. at 84.
[280]Id.
[281]R. at 84-85.
[282]R. at 84.
[283]R. at 85.
[284]Id.
[285]R. at 84.
[286]Id.
[287]R. at 84-85.
[288]R. at 85.

suggest that Mr. Lyles stopped taking Paxil, while her report indicates that he is still taking it.[289]

Even though the ME did not see Dr. Shariff's latest report prior to the hearing, the ALJ decided not

to send the report back to him to consider because it was so lacking in evidentiary support.[290] The

ALJ determined that even if the ME did see the report, it would not change his RFC analysis.[291]

 Since the ALJ declined to determine whether Mr. Lyles was capable of returning to past

work, she proceeded to the fifth step of the test, which was to evaluate whether Mr. Lyles was able

to perform any other work existing in significant numbers in the national economy.[292] The ALJ

determined, that considering his age, education, work experience, and RFC, that jobs existed in

significant numbers in the national economy that he could perform.[293] Based on the VE's testimony,

the ALJ determined that Mr. Lyles could perform jobs in the Chicagoland area as a light assembler,

light hand packager, and light cashier.[294] Since there were jobs available that Mr. Lyles could

perform, he was not disabled as defined by the Act.[295]

## III. STANDARD OF REVIEW

 The court must sustain the Commissioner's findings of fact if they are supported by

substantial evidence and are free of legal error.[296] Substantial evidence is relevant evidence that a

reasonable mind might accept as adequate to support a conclusion.[297] The standard of review is

deferential, but the reviewing court must conduct a critical review of the evidence before affirming

---

[289]R. at 85.
[290]R. at 84.
[291]*Id.*
[292]20 C.F.R. § 404.1520(a)(4)(v).
[293]R. at 86.
[294]*Id.*
[295]*Id.*
[296]42 U.S.C. § 405(g).
[297]*McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011).

the Commissioner's decision.[298] Where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a plaintiff is disabled falls upon the Commissioner and not the court.[299] Although the ALJ need not address every piece of evidence or testimony presented, he must adequately discuss the issues and build an accurate and logical bridge from the evidence to conclusion.[300] The court will conduct a critical review of the evidence and will not uphold the ALJ's decision if it lacks evidentiary support or an adequate discussion of the issues.[301]

## IV. ANALYSIS

Mr. Lyles argues that (1) the ALJ's decision was not supported by substantial evidence and (2) the ALJ erred by not giving Dr. Shariff's opinion controlling weight.[302] In examining his claims, we find that the case must be remanded to the SSA because the ALJ did not adequately address Mr. Lyles's non-cardiac chest pain in finding Mr. Lyles not disabled. In coming to this finding we note that Mr. Lyles's argument was difficult to decipher. Perhaps unwittingly, he did raise one issue that requires remand.

**A.      The ALJ did not err in giving minimal weight to Dr. Sharif's opinion and controlling weight to the state agency physicians and ME's opinions.**

Mr. Lyles asserts that Dr. Shariff's opinions were supported by substantial evidence in Mr. Lyles's medical record and, therefore, should have been given controlling weight over the opinions of the ME.[303] The Commissioner responds that the ALJ properly weighed and credited the various medical opinions.[304] The Commissioner asserts that the ALJ reasonably gave Dr. Shariff's opinions

---

[298]*Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008).
[299]*Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir.1990) (quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir.1987)).
[300]*Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir.2010), *McKinzey*, 641 F.3d at 889.
[301]*Clifford v. Apfel*, 227 F.3d 863, 839 (7th Cir.2000).
[302]Pl. Mot at 4-15, dkt. 45.
[303]*Id.* at 14-15.
[304]Def. Resp. at 4-7, dkt. 46.

minimal weight because they were not supported by substantial evidence in the medical record and were not internally consistent.[305]

A treating physician's opinion is only given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the medical record.[306] The Seventh Circuit has interpreted this rule to mean that "once well-supported contradicting evidence is introduced, the treating physician's opinion is no longer entitled to controlling weight."[307] Furthermore, the ALJ "may discount" the treating physician's opinion if it is "internally consistent, or based on the patient's subjective complaints."[308] Ultimately, "the weight properly to be given . . . depends on the circumstances."[309]

We find that the ALJ properly afforded Dr. Shariff's opinions minimal weight and clearly articulated why she did so. The ALJ noted inconsistencies between Dr. Shariff's treatment notes and what she reported to the SSA.[310] For example, Dr. Shariff documented in her second evaluation that Mr. Lyles was still taking Paxil, her treatment notes indicated that he had stopped taking it.[311] Also, while Dr. Shariff reported that Mr. Lyles suffered from various mental health issues, as well as a number of cardiac problems and finger tingling and/or numbness, these are not adequately addressed in the treatment notes, nor are they verifiable anywhere else in the medical record.[312] The ALJ also pointed to internal inconsistencies between Dr. Shariff's letters and medical evaluation forms, in that on one hand she definitively stated that Mr. Lyles was disabled and on the other hand, at least

---

[305]Def. Resp. at 4-7, dkt. 46.
[306]20 C.F.R. § 404.1527(c)(2).
[307]*Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006).
[308]*Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008).
[309]*Hofslien*, 439 F.3d at 377.
[310]R. at 83-84.
[311]*Id.*
[312]R. at 82-85.

one of her medical evaluations would have rendered him able to work based on SSA guidelines.[313] We find that the ALJ had a basis for reducing the amount of weight she awarded to Dr. Shariff as a treating physician and sufficiently explained her reasoning for doing so.

In his reply brief, Mr. Lyles argues that the ALJ should not have given controlling weight to the ME's opinion because the ME's testimony was not reliable.[314] Mr. Lyles specifically refers to the ME's references to "outdated and/or inadequate test results; improper use of stress tests [sic] results to generate an RFC; . . . misreading of the medical records, . . . careless and incomplete review of the records, or . . . lack of medical knowledge."[315] As will be discussed later in this opinion, we find the ALJ's reliance on the ME's opinions to be proper. There were discrepancies in the medical evidence. When there is conflicting medical evidence, "weighing [it] is exactly what the ALJ is required to do."[316] We disagree with Mr. Lyles that Dr. Shariff's opinions are "the only opinions . . . that are entitled to any weight, [and therefore] controlling weight."[317] We find that the ALJ weighed the conflicting testimony and did not err in giving the ME's opinion controlling weight over Dr. Shariff's opinion.

### B. The ALJ's decision regarding Mr. Lyles's heart condition was supported by substantial evidence but she did not adequately explain her decision regarding his non-cardiac chest pain.

Mr. Lyles argues that the ALJ's decision was not supported by substantial evidence.[318] The gist of his argument is that she erred in relying on the ME's testimony because the ME

---

[313]R. at 84-85.
[314]Pl. Reply at 7, dkt. 47.
[315]Id.
[316]Young v. Barnhart, 362 F.3d 995, 1001 (7th Cir. 2004).
[317]Pl. Mot. at 14-15, dkt. 45.
[318]Id. at 4-13.

unreasonably evaluated the evidence.[319] Mr. Lyles only challenges the ALJ's decision as it relates to his alleged heart conditions and chest pain in the area around his heart. As such, we find that he has accepted the ALJ's findings relating to his other ailments.

Before we reach this argument, we reject Mr. Lyles's contention that the ME was biased against him when the ME asked him questions, not only because it is a conclusory argument not grounded in law, but because the ME's questions to Mr. Lyles were entirely relevant to his testimony in the case.

We also find that the ALJ's conclusion regarding Mr. Lyles's alleged heart condition is supported by substantial evidence. Substantial evidence is relevant evidence that a reasonable mind might accept as adequate to support a conclusion.[320] However, we find that she did not adequately explain why she discredited his subjective complaints regarding pain in the area around his heart. We find it necessary to separate the argument into these two components because Mr. Lyles's briefs, the ALJ's opinion, and the doctors' notes in the record all treat the two differently. The distinction is necessary because although the ALJ relies on the ME's testimony that Mr. Lyles does not have a disabling heart condition, this does not preclude him from having disabling non-cardiac chest pain. We address the two complaints in turn.

### 1.    Mr. Lyles's alleged heart conditions.

Mr. Lyles contends that, in light of Dr. Shariff's letters stating that he suffered from arrhythmia, coronary artery disease, and muscle strain-cardiac, the ALJ erred in relying on the ME's opinions.[321] Mr. Lyles argues that the ME improperly relied on inaccurate readings of the two

---

[319]Pl. Mot. at 2, dkt. 45.
[320]*McKinzey*, 641 F.3d at 889.
[321]Pl. Mot. at 6, dkt. 45.

exercise stress tests that Mr. Lyles underwent in 2002 and 2006.[322] He alleges that the ME made a factual error in determining that an ejection fraction of fifty percent, in someone who does not reach eighty five percent of their maximum heart rate on an exercise stress test, is normal and that, therefore, the ME erred in using the results of the test to come to his conclusion that Mr. Lyles did not suffer any debilitating heart disease.[323] He also argues that the ME's reliance on the test results was erroneous because even a negative stress test does not rule out coronary heart disease.[324] Furthermore, Mr. Lyles contends that because of the age of the test results, that they were out of date.[325] Essentially, Mr. Lyles is asking us to weigh whether, in fact, the ME was correct in asserting that the test results were valid. This, however, is not the court's function since we do not weigh evidence.[326] The issue, therefore, is whether the ALJ made a legal error in determining that Mr. Lyles's condition did not meet the requirements of Listing 4.04 (*i.e.* whether other evidence existed that would cause a reasonable mind to find that the ALJ's reliance on the ME's testimony was inadequate to support her decision).

We find that the ALJ made no such error. First, we turn to SSA regulations, which state that to satisfy listing 4.04 the claimant must be able to provide objective evidence that his symptoms are due to myocardial ischemia.[327] Per the regulation, objective evidence includes results of electrocardiograms ("ECGs"), exercise tolerance tests, drug-induced stress tests, cardiac catheterization, or Doppler tests.[328] After a thorough review of the record, we find no indication that

---

[322] Pl. Mot. at 6, dkt. 45.

[323] *Id.* at 7-8

[324] *Id.* at 8-9.

[325]

[326] *Clifford*, 227 F.3d at 869 ("In our substantial evidence determination, we review the entire administrative record, but do not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner.").

[327] 42 USCA APP., 20 CFR PT. 404, Subpt. P, App. 1

[328] *Id.*

Mr. Lyles is able to provide any objective evidence, as defined by the SSA, that his symptoms are due to myocardial ischemia (this is including a review of his primary care physician's opinion).

Mr. Lyles contends in his reply brief that the ALJ failed to fully and fairly develop the record.[329] Although Mr. Lyles forfeited this argument because he brought it up for the first time in his reply brief, because the argument is easy to dispose of, we address it briefly.[330] In making the contention, he cites to *Nelms v. Astrue*.[331] In *Nelms*, the Seventh Circuit held that ALJs owe claimants who are not represented by attorneys a higher duty to fully develop a full and fair record, to the extent that they must "'scrupulously and conscientiously [ ] probe into, inquire of, and explore for all the relevant facts.'"[332] The court went on to hold that it:

> generally upholds the reasoned judgment of the Commissioner on how much evidence to gather, even when the claimant lacks representation. Accordingly, 'a significant omission is usually required before this court will find that the [Commissioner] failed to assist *pro se* claimants in developing the record fully and fairly.' And an omission is significant only if it is prejudicial. 'Mere conjecture or speculation that additional evidence might have been obtained in the case is insufficient to warrant a remand.' Instead a claimant must set forth specific, relevant facts-such as medical evidence-that the ALJ did not consider.[333]

In Mr. Lyles's case, we are satisfied that there was enough evidence in the medical record for the ALJ to make a decision based on substantial fact. Even though Mr. Lyles was not represented by an attorney, he was represented by a zealous advocate, who made sure to submit as many medical records as possible to the ALJ before the ALJ's two week deadline passed after the hearing. We are further satisfied that there was no significant omission in terms of evidence that would have led

---

[329]Pl. Reply at 4, dkt. 47.
[330]*See Narducci v. Moore*, 572 F.3d 313, 324 (7th Cir. 2009) ("[T]he district court is entitled to find that an argument raised for the first time in a reply brief is forfeited.")
[331]553 F.3d 1093, 1098 (7th Cir. 2009)
[332]*Id.* (omission in original)(quoting *Smith v. Sec. of Health, Educ. & Welfare*, 587 F.2d 857, 860 (7th Cir.1978)).
[333]*Nelms*, 553 F.3d at 1098 (citations omitted) (omission & emphasis in original).

reasonable minds to come to the conclusion that the ALJ was unreasonable in her decision.

In terms of Mr. Lyles's argument that the ME's various references to the exercise tests were unreasonable because he did not reach eighty-five percent of his maximum heart rate, we disagree. Our district court has previously held that Listing 4.04 "nowhere indicates that an 85% rate is a minimum beyond which a treadmill test is not diagnostic" and that an ALJ's decision to accept the results of an exercise test when the maximum heart rate achieved is less than eighty-five percent is not contrary to the regulations.[334] Absent any Seventh Circuit case law dictating otherwise, we see no reason to disagree with this holding. Whether the fifty percent ejection fraction was normal is irrelevant. Following his 2002 stress test and ECGs, the cardiologist documented that there was "no evidence of exercise induced myocardial ischemia."[335] Following the 2006 stress exercise test and ECGs, the cardiologist documented that "there has been no significant change compared to the previous study" and that there was "no active disease."[336] It is not our place to disturb the treating cardiologists' clinical judgments, nor that of the ME, also a cardiologist. It was reasonable for the ALJ to rely on their collective expertise and we defer to her authority to resolve factual disputes.

We similarly defer to the cardiology experts and the ALJ in terms of Mr. Lyles's arguments regarding ejection fraction, false negative findings, out of date tests, post-test deterioration, and enzyme tests.[337] If any of these were in error, they were harmless error.[338] Neither a fifty percent ejection fraction, the possibility of a false negative, the potential of the test results being out of date, not showing deterioration, nor the presence of enzymes is objective evidence of ischemic heart

---

[334]*Mayfield v. Sullivan*, 730 F. Supp. 180, 186 (N.D. Ill. 1990).
[335]R. at 339.
[336]R. at 371.
[337]Pl. Mot. at 8-12, dkt. 45.
[338]*Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010) ("The doctrine of harmless error indeed is applicable to judicial review of administrative decisions.")

disease. Because, as a matter of law, Mr. Lyles is not able to demonstrate that he meets the listing requirements for 4.04, we find that the ALJ's decision that Mr. Lyles did not suffer from a disabling heart condition is supported by substantial evidence and free of legal error.

### 2.      Mr. Lyles's chest pain

The only area that we find rquires additional explanation is the ALJ's finding that Mr. Lyles's non-cardiac chest pain was not disabling. Mr. Lyles cites to numerous places in the medical record that indicate that he did, in fact, suffer from chest pain.[339] The issue before the ALJ, however, was not whether Mr. Lyles suffered from chest pain, it was whether his chest pain was disabling. While she finds that Mr. Lyles's "atypical chest pain (non anginal)" is a severe impairment and acknowledges that there "is evidence of some chest discomfort," she then states that it does not "warrant a finding of disability."[340] She states that Mr. Lyles "exaggerates the extent and duration of his chest pain," but does not adequately state why.[341]

In finding that a plaintiff's subjective complaints are not credible, the ALJ need not accept them if they conflict with objective evidence in the record.[342] However, she must thoroughly examine the evidence and clearly articulate her findings.[343] This is because in reviewing the ALJ's decision, we do not assess the whole record, only the reasons she gives.[344] A negative determination of credibility must "contain specific reasons for the finding . . . supported by evidence . . . and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight

---

[339]Pl. Mot. at 4-5, dkt. 45.
[340]R. at 78, 82.
[341]R. at 83.
[342]*Arnold v. Barnhart*, 473 F.3d 816, 822-23 (7th Cir. 2007).
[343]*Castile v. Astrue*, 617 F.3d 923, 930 (7th Cir. 2007).
[344]*Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002).

the adjudicator gave to the individual's statements and the reasons for that weight."[345] The credibility

finding must "build an accurate and logical bridge between the evidence and the result."[346]

> In discrediting Mr. Lyles's subjective complaints of chest pain, the ALJ reasoned that:

> he used Motrin and heat for the shoulder pain until this year when Dr. Shariff prescribed Vicodin. This is contrary to Dr. Shariff's note stating that she prescribed Vicodin in December 2008 because he said it calmed him, and in the absence of notes of shart [sic] stabbing daily pains at the time.[347]

She then stated that "despite his subjective statements, several emergency room visits and office

visits with complaints of pain have resulted in normal physical examination findings" citing notes

from Mr. Lyles medical record in June 2006, June 2007, July 2007, and July 2008.[348] Finally, she

says that "Dr. Shariff[] opined that he is capable of sustaining full-time work at the sedentary level"

in her medical evaluation forms and that her "progress notes repeatedly state that pain does not

interfere with activity level. . . . [T]hat is, until April 8, 2009, shortly before the hearing [when Mr.

Lyles] began to describe a somewhat different type of pain in his left upper chest region."[349]

> This explanation does not meet the Seventh Circuit's requirements for building a logical

bridge. First, the inconsistencies between Dr. Shariff's documentations regarding Vicodin does not

speak to whether Mr. Lyles's chest pain is disabling. We note that the physicians at Mercy

prescribed him Vicodin during his hospitalizations in 2006 because of his reports of pain.[350] The

June 2006 physical examination also does not address Mr. Lyles's chest pain.[351] In fact, the ALJ's

citation to this examination is confusing because during the hospitalization in which this

---

[345]SSR 96-7p, 1996 WL 374186 (July 2, 1996).
[346]*Castile*, 617 F.3d at 929 (quoting *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000)).
[347]R. at 83.
[348]*Id.*
[349]*Id.*
[350]R. at 362.
[351]*Id.*

examination took place, Mr. Lyles was diagnosed with right flank pain as a result of a kidney stone, *followed by atypical chest pain.*[352] We are not satisfied that any thorough medical evaluations were performed on the other dates cited by the ALJ. We note that Mr. Lyles was also found to suffer from "atypical chest pain" at his July 2007 ACHN visit. [353] To the ALJ's point that Dr. Shariff found that Mr. Lyles could perform sedentary work, considering that the ALJ strongly discredits Dr. Shariff's findings and that Dr. Shariff made it very clear in her letters that she thought that Mr. Lyles could not work, we find that this is also not sufficient reasoning for finding his chest pain not to be disabling.

What the ALJ has missed is that although Mr. Lyles says that he has chest pain because of one or more heart conditions, finding that he did not suffer from the heart conditions does not preclude him from suffering from another type of pain, the origin of which he does not know. As the Seventh Circuit has stated, "[t]he etiology of pain is not so well understood, [and] people's pain thresholds [are not] so uniform, that the severity of pain experienced by a given individual can be 'read off' from a medical report."[354] We believe the court was specifically warning against brushing off people's complaints of pain instead of carefully analyzing them. As such, we find that the case requires remand for the ALJ to more thoroughly analyze her finding that Mr. Lyles's pain was not debilitating.

To clarify, we are not addressing whether the ALJ's finding was factually correct or incorrect, only that she failed to sufficiently explain her finding. It is entirely possible that Mr. Lyles's chest pain is not debilitating. Dr. Jimenez, in his RFC evaluation, found this to be the case.

---

[352]R. at 463 (emphasis added).
[353]R. at 486.
[354]*Martinez v. Astrue*, 630 F.3d 693, 697 (7th Cir. 2011).

This RFC determination was corroborated by both Dr. Mack and the ME. Mr. Lyles's medical record contains notes stating that he continued to smoke, years after he started complaining of chest pain, and that he was noncompliant with his doctor's 2002 prescription of aspirin for chest pain.[355] While Mr. Lyles reported on his disability report that he was unable to climb stairs, he testified during the hearing that he had no trouble navigating the steps to his apartment. In 2002, doctors stated that Mr. Lyles could return to work after a hospitalization. A 2008 discharge summary stated that there was "no limitation on [Mr. Lyles's] range of motion [and that he] has 5/5 strength globally."[356] Documentation from the same hospitalization indicated that doctors found that Mr. Lyles was not disabled and did not significantly restrict his activity.[357] All of this is to repeat that we do not find that the ALJ's findings lacked substantial evidence. She simply did not sufficiently explain the issue of Mr. Lyles's pain.

### C. Minor issues regarding Dr. Shariff's treatment notes and evaluations

Mr. Lyles raises a couple of issues regarding Dr. Shariff's documentation that the ALJ interprets one way and he interprets another way. First are the form lines in her treatment notes that indicate whether "pain is affecting your activity level" and whether there is "pain you would like your provider to address." Both the ALJ in her opinion, and the Commissioner in his brief, attribute significance to these negative findings. We agree with Mr. Lyles that this is likely a pre-generated computer answer, because it would be illogical that he would actually have answered these questions in the negative when the point of many of his doctor's visits was to address his pain. We feel that the ALJ can adequately address the issue of whether Mr. Lyles's pain was disabling without relying

---

[355]R. at 328.
[356]R. at 496.
[357]R. at 496, 619.

on this evidence.

Mr. Lyles then raises an issue with the medical evaluation that Dr. Shariff completed in June 2009.[358] First, we disagree with the Commissioner's assertion that this evidence was submitted too late to be considered by the ALJ in her decision.[359] The ALJ held the record open for two weeks following the hearing and Mr. Lyles submitted the report on the fourteenth day.[360] Regarding the completion of the form itself, Dr. Shariff's answer to Mr. Lyles's limitation in sitting is ambiguous.[361] In her opinion, the ALJ reads the marking as a "B," which would indicate that Mr. Lyles's limitations in siting was up to twenty percent, whereas Mr. Lyles reads the marking as a "D," which would indicate over fifty percent limitation. Because the ALJ has clearly discredited Dr. Shariff's opinions, she can address the issue without relying on this report, given the present ambiguity.

Finally, we recognize that Mr. Lyles's present counsel was appointed by the Court. We thank him for the time and effort he contributed to Mr. Lyles's case.

## IV.     CONCLUSION

For the reasons set forth above, Mr Lyles's motion for summary judgment is granted [dkt. 44] and the case is remanded to the SSA for proceedings consistent with this opinion.

**IT IS SO ORDERED**.

_____
Susan E. Cox
United States Magistrate Judge

Date: <u>October 10, 2012</u>

---

[358]R. at 600-604.
[359]Def. Resp. at 10, dkt 46.
[360]R. at 67, 599.
[361]R. at 603.